UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TANGER FACTORY OUTLET CENTERS,
INC., *et al.*,

       Plaintiffs,

v.

CLARENCE H. FALSTAD, *et al.*,

       Defendants.

_____/

Case No. 1:18-cv-203

HON. JANET T. NEFF

## OPINION AND ORDER

Plaintiffs Tanger Factory Outlet Centers, Inc. and Tanger Grand Rapids, LLC (collectively, Plaintiffs or "Tanger") filed this civil action against Defendants Clarence H. Falstad (Falstad) and Access Technologies Services, Inc. (Access) to recover for damages caused by alleged abuse of process, trespass, and civil RICO violations in connection with an underlying 2017 case. Now pending before the Court is Defendants' Motion to Dismiss (ECF No. 25). For the following reasons, the Court concludes that Defendants' motion is properly granted and this case closed.

### I. BACKGROUND

According to Plaintiffs, Falstad, an architect, serves as president, secretary, treasurer, and director of Access (Am. Compl. ¶ 9). Access describes itself as "a leader in compliance litigation management as it relates to Federal Statutes," specifically the Americans with Disabilities Act (ADA) and the Fair Housing Act (FHA) (*id.*). Plaintiffs allege that Falstad conducts Access's affairs by contacting individuals across the country and encouraging them to file lawsuits against

1

entities that Falstad believes are in violation of the ADA and/or FHA (*id.* ¶ 10).  Falstad is not an attorney and is not licensed to practice law (*id.* ¶ 11).  Plaintiffs allege that Falstad solicits attorneys to represent these individuals, supplies the attorneys with a form complaint, requires the attorneys to use Falstad as their "expert witness," and actively manages the ensuing litigation (*id.*).  According to Plaintiffs, Falstad has claimed that he intends to initiate 100 ADA claims in 2018; 1,000 in 2019; and 3,000 in 2020 (*id.* ¶ 12).

Plaintiffs allege that while Falstad does not charge individual clients for his "services," he insists on collecting "expert fees" from the defendants sued, sometimes long before any judgment is rendered (Am. Compl. ¶ 13).  Plaintiffs allege that Falstad "routinely uses the fee-shifting provisions of the ADA and FHA to intimidate defendants into settling ADA and FHA claims that have little or no merit," that Falstad "bills his time in one-hour increments, and frequently demands six-figure fees from defendants as a precondition to any settlement" (*id.* ¶ 14).

In or about March 2016, Falstad contacted William Frederick Saar, allegedly because Falstad had recently seen an online review that Saar had posted about the Tanger Outlets shopping mall in Byron Center, Michigan (hereinafter, the "Tanger Property") (Am. Compl. ¶¶ 15-16).  According to Plaintiffs, Falstad encouraged Saar to file a lawsuit against Tanger for alleged violations of the ADA at the Tanger Property (*id.* ¶ 16).  Falstad subsequently contacted Michigan attorneys James C. Higgs and Michael C. Hyde, who represented Saar in an ADA claim against Tanger (*id.* ¶ 17).  Plaintiffs allege, on information and belief, that neither Higgs nor Hyde had previously litigated an ADA claim in federal court (*id.*).

Plaintiffs further allege that Falstad provided Higgs and Hyde with a form complaint that Falstad had previously drafted and supplied to other attorneys involved in other ADA litigation

(Am. Compl. ¶ 18). Falstad allegedly instructed Higgs and Hyde to name Steven B. Tanger, the president and CEO of Tanger, and Randy Zimmerman, general manager of the Tanger Property, as personal capacity defendants in an attempt to induce prompt settlement of the case and an accompanying payment of "expert witness" fees to Falstad (*id.* ¶ 21). The Complaint was filed in this Court on January 13, 2017 and assigned the caption *Saar v. Tanger Factory Outlet Centers, Inc., et al.*, W.D. Mich. No. 1:17-cv-00041-JTN-ESC (hereinafter, the "ADA Lawsuit") (*id.* ¶ 23).

Plaintiffs further allege that after receiving notice of the ADA Lawsuit, Tanger contacted Higgs and Hyde and expressed concern that Higgs and Hyde had improperly named Stephen B. Tanger and Randy Zimmerman as individual defendants (Am. Compl. ¶ 24). Hyde allegedly explained in response to Tanger that he had been directed to name them by the "engineer," a presumptive reference to Falstad (*id.*). On April 14, 2017, Saar filed an Amended Complaint to name Tanger Factory Outlet Centers, Inc. and Tanger Grand Rapids, LLC as the defendants in the ADA Lawsuit (*id.* ¶ 25).

The parties to the ADA Lawsuit agreed to meet for mediation on October 11, 2017 (Am. Compl. ¶ 27). Counsel for Tanger requested that Falstad, through Hyde, supply a list of alleged barriers to access at the Tanger Property (*id.*). Falstad failed to identify any specific barriers to access at the Tanger Property; however, on October 4, 2017, as part of Saar's pre-mediation settlement demand, he provided Tanger with an invoice and billing statement in the amount of $125,500.00 for "architectural professional litigation expenses and costs" supposedly incurred by Access (hereinafter, "First Invoice") (*id.* ¶¶ 28-34). Plaintiffs allege that Falstad fabricated many of the entries in the First Invoice to inflate his "expert witness" costs and intimidate Tanger into settling the ADA Lawsuit at the October 11, 2017 court-ordered mediation (*id.* ¶¶ 35-37).

3

Plaintiffs allege that at the October 11, 2017 mediation, Hyde was unable to identify specific barriers to access or explain how the Tanger Property was not in compliance with the ADA (Am. Compl. ¶ 38). Hyde allegedly stated that any such information would have to come from Falstad, and Hyde agreed to do his best to obtain this information from Falstad and produce it to counsel for Tanger by November 6, 2017 (*id.* ¶ 39). Tanger did not receive any data supporting the allegations in the ADA Lawsuit by November 6, 2017 (*id.* ¶ 40). Counsel for Tanger wrote to Hyde that same day, but Hyde did not respond to this correspondence from Tanger's counsel (*id.*). When it became clear to Tanger that the data and other information discussed during the October 11, 2017 mediation was not forthcoming, Tanger filed a motion for judgment on the pleadings on November 7, 2017 and asked the court to dismiss the ADA Lawsuit on the grounds that Saar lacked Article III standing to seek prospective injunctive relief under Title III of the ADA (*id.* ¶ 41). During a November 16, 2017 telephone conference call with the mediator, Hyde stated that he would contact Falstad and instruct him to provide his entire case file to counsel for Tanger (*id.* ¶ 42). Tanger agreed to participate in a second mediation session in Grand Rapids on December 20, 2017, with the understanding that Falstad would be providing Tanger with information concerning specific alleged ADA violations at the Tanger Property well in advance (*id.* ¶ 43).

On or about November 24, 2017, allegedly in an effort to obtain information in support of Falstad's conclusory allegations of ADA non-compliance, Falstad and Access conducted an unauthorized "survey" of the Tanger Property (Am. Compl. ¶ 44). Plaintiffs allege that no request to inspect the Tanger Property was made (formally or informally) to Tanger or to counsel for Tanger prior to this unauthorized and undisclosed inspection (*id.*). During the November 24,

2017 "survey," Falstad and Access conducted various tests on the Tanger Property (*id.* ¶ 45). Several of these "tests" involved Falstad using equipment designed to measure the slope or gradient of walkways throughout the Tanger Property (*id.*). This equipment was placed by Falstad on walkways and in parking spaces used by the public to access the Tanger Property (*id.*). Additionally, several of Falstad's unauthorized "tests" took place directly in front of stores occupied by tenants of the Tanger Property (*id.*). Falstad's unauthorized "survey" of the Tanger Property was documented by Falstad in photographs that were later produced to Tanger during the December 20, 2017 mediation (*id.* ¶ 46).

Plaintiffs allege that following his unauthorized "survey," Falstad sent follow-up correspondence to Hyde on Access letterhead on December 1, 2017, indicating that "[i]n our discussion on attorney fees you are expecting full payment because it is Federal Civil Rights law; and Section 12205 Attorney's Fees, also has costs, and my ADA EXPERT WITNESS architectural professional costs to date are $166,479.00 and l expect the same" (Am. Compl. ¶ 48). Falstad ended his letter to Hyde with the following note: "Keep up the good work, you are doing a great job. If you need anything from me, just let me know as you have been doing in the last several months" (*id.* ¶ 49). Enclosed with Falstad's December 1, 2017 correspondence to Hyde was a second set of invoices from Falstad for "architectural professional costs," which purported to document costs incurred by Access on the ADA Litigation from March 11, 2016 through December 1, 2017 in the amount of $166,479.00 (hereinafter, "Second Invoice") (*id.* ¶ 50). Plaintiffs allege that like the First Invoice, the Second Invoice contains false, fraudulent, and inflated charges for time purportedly spent by Falstad and his associates on the ADA Litigation (*id.* ¶¶ 51-53). Plaintiffs allege that Falstad transmitted the Second Invoice by email from Nevada

to Hyde in Michigan with instructions that the Second Invoice be given to counsel for Tanger in anticipation of the December 20, 2017 mediation (*id.* ¶ 54).

Several days later, in an email to Hyde on December 4, 2017, Falstad wrote, "The comments have been favorable, so let's move on as we move into 2018 with our program" (Am. Compl. ¶ 55). According to Plaintiffs, Falstad's use of the term "our program" referred to Falstad's direction of the ADA Lawsuit in an attempt to extort "expert witness" fees from Tanger based on false and fraudulent invoices (*id.* ¶ 56).

On December 19, 2017, counsel for Tanger deposed Saar in Grand Rapids, Michigan, dedicating an extensive portion of Saar's deposition to his interactions with Falstad (Am. Compl. ¶ 57). In response to seeing the First Invoice, Saar testified that many of the time entries recorded by Falstad and his associates were false and/or significantly inflated (*id.* ¶¶ 58-60). At the conclusion of Saar's deposition, Hyde informed counsel for Tanger (for the first time) that Falstad had conducted a "survey" of the Tanger Property on or about November 24, 2017 (*id.* ¶ 61).

On December 20, 2017, the day after Saar's deposition, Tanger participated in a second mediation session with Saar and Hyde, at which time Tanger was presented with the Second Invoice (Am. Compl. ¶¶ 62-64). Tanger did not receive any additional information or data during the December 20, 2017 mediation supporting Falstad's conclusion that the Tanger Property contained barriers to access in violate of the ADA (*id.* ¶ 65). The mediation was unsuccessful (*id.* ¶ 66).

Counsel for Tanger subsequently requested that Falstad avail himself for deposition as Saar's "expert witness" (Am. Compl. ¶ 67). In response, Falstad wrote to Hyde on January 10,

2018 and outlined his "preconditions" to voluntarily appearing for deposition, requesting, in pertinent part, as follows:

> As your ADA Expert architect I will look to you to make my travel arrangements and food and lodging arrangements, and this is at your cost.
>
> I will look to the opposing party for deposition fees. My hourly rate is $350.00 dollars per hour and during the actual deposition it is $700.00 per hour. I will be spending 5 days in preparation, so that is $3,000.00 dollars a day or a total of $15,000.00 dollars and that is to be paid by the opposing party before I testify.
>
> I assume that we will be spending one day there in Michigan before my deposition as my final tune-up. There may be more costs that I am not aware of today.

(*id.* ¶¶ 67-68). Tanger refused to pay Falstad anything other than the statutorily-mandated witness fee of $40 per day (*id.* ¶ 69).

On January 12, 2018, Tanger's Motion for Judgment on the Pleadings was granted, and Saar's Amended Complaint was dismissed for lack of Article III standing (Am. Compl. ¶ 70). Attorney Hyde subsequently sent correspondence to counsel for Tanger, indicating, in pertinent part, that Falstad "expects to be involved in over 1000 cases by the end of 2019" and that he did "not practice in that manner and on ethical grounds feel that such 'churning' violates every reason I became an attorney" (*id.* ¶ 71).

Plaintiffs initiated this case against Defendants on February 26, 2018 (ECF No. 1), filing an Amended Complaint on June 28, 2018 (ECF No. 18). Against both Defendants, Plaintiffs allege Abuse of Process (Count I) and Trespass on Land (Count II). Against Defendant Falstad, only, Plaintiffs allege civil violations of the Racketeer Influenced and Corrupt Organizations Act (RICO) (Count III). Pursuant to this Court's briefing schedule (ECF No. 21), Defendants subsequently filed their Motion to Dismiss Plaintiffs' Amended Complaint (ECF No. 25) and

7

supporting brief (ECF No. 26). Plaintiffs filed a response in opposition (ECF No. 27), to which Defendants filed a Reply (ECF No. 28). Having considered the parties' submissions, the Court concludes that oral argument is unnecessary to resolve the issues presented. *See* W.D. Mich. LCivR 7.2(d).

## II.  ANALYSIS

### A.  Motion Standard

Federal Rule of Civil Procedure 12(b)(6) authorizes the court to dismiss a complaint if it "fail[s] to state a claim upon which relief can be granted[.]" FED. R. CIV. P. 12(b)(6). In deciding a Rule 12(b)(6) motion, a court must construe the complaint in the light most favorable to the non-movant and accept all well-pleaded factual allegations in the complaint as true. *Thompson v. Bank of Am., N.A.*, 773 F.3d 741, 750 (6th Cir. 2014). To survive a motion to dismiss, the complaint must present "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557, 570 (2007). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### B.  Discussion

1.  **Count I:  Abuse of Process**

    a.  Collateral Attack

Defendants first argue that Plaintiffs' abuse of process claim fails because Defendants' involvement in a federal lawsuit cannot support a state-law abuse of process claim (ECF No. 26 at

PageID.214, 220-221, citing *Cruz v. Don Pancho Market, LLC*, 171 F. Supp. 3d 657, 659 (W.D. Mich. 2016)).

In response, Plaintiffs argue that because Michigan's common-law tort of abuse of process is not a "positive statutory enactment or procedural rule," the tort is not preempted and may be asserted as a substantive state-law claim (ECF No. 27 at PageID.245).

Defendants' argument has merit.

The underlying ADA Lawsuit was brought under this Court's federal-question jurisdiction. 28 U.S.C. § 1331. To the extent a pleading or other paper was presented for any improper purpose, such as to harass or needlessly increase the cost of litigation, such conduct is governed by Federal Rule of Civil Procedure 11. Where a court determines that Rule 11 has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation. FED. R. CIV. P. 11(c)(1). A federal abuse of process claim does not exist in the Sixth Circuit. *Rapp v. Dutcher*, 557 F. App'x 444, 448 (6th Cir. 2014). For the reasons more fully stated by Defendants, the Court agrees that a state-law abuse of process claim is not properly employed to collaterally attack alleged abuses in federal proceedings. *See, e.g., Cruz*, 171 F. Supp. 3d at 659.

    b.    Elements of Abuse of Process

Defendants also argue that even if a federal-question lawsuit may properly give rise to a state-law abuse of process claim, Plaintiffs failed to allege the elements of an abuse of process claim in Count I where (1) Plaintiffs' allegation that Defendants used Saar as a "proxy" to instigate the ADA Lawsuit does not state an abuse-of-process claim (ECF No. 26 at PageID.221, quoting Am. Compl. ¶ 76); (2) Plaintiffs have failed to allege that Defendants had a sufficient ulterior

9

motive (*id.* at PageID.214, 221-222); and (3) Plaintiffs have failed to allege that Defendants used any process in the ADA Lawsuit (*id.* at PageID.214, 222-223).

In response, Plaintiffs concede that the initiation of a lawsuit, in and of itself, is insufficient to state a claim for abuse of process under Michigan law, but Plaintiffs point out that they further alleged that Defendants committed an abuse of process after initiating the ADA Lawsuit by presenting fraudulent "invoices" to Tanger in the context of court-ordered mediation proceedings (ECF No. 27 at PageID.245, citing Am. Compl. ¶¶ 78-80). Plaintiffs argue that they have also sufficiently alleged that Defendants acted with an ulterior purpose in alleging that Defendants extorted payments collateral to, and inconsistent with, the purpose of the underlying ADA Lawsuit (*id.* at PageID.246-247, citing Am. Compl. ¶¶ 78-80). Last, Plaintiffs opine that Defendants' behavior in abusing the mediation proceedings for their own ulterior purpose constitutes the misuse of the proceedings for a purpose other than that which it was designed to accomplish (*id.* at PageID.248).

In reply, Defendants point out in the context of the ADA Lawsuit, the request for payment of Defendants' fees was not "secondary to the suit;" rather, recovery of expert fees is expressly permitted by the ADA (ECF No. 28 at PageID.265, citing 42 U.S.C. § 12205). Defendants further emphasize that Defendants were not parties to the ADA Lawsuit and could not use process in that lawsuit (*id.* at PageID.266-267).

Defendants' argument has merit.

The parties agree that "[t]o recover upon a theory of abuse of process, a plaintiff must plead and prove (1) an ulterior purpose and (2) an act in the use of process which is improper in the

10

regular prosecution of the proceeding," *Friedman v. Dozorc*, 312 N.W.2d 585, 594 (Mich. 1981) (ECF No. 26 at PageID.221; ECF No. 27 at PageID.246).

In Count I, Plaintiffs allege that "Falstad acted with the ulterior purpose of profiting from the ADA Lawsuit . . . ." (Am. Compl. ¶ 77). Plaintiffs allege that "Falstad abused the legal process by creating the false, fraudulent, and grossly exaggerated First Invoice and Second Invoice on behalf of Access as part of settlement demands conveyed in anticipation of the court-ordered . . . mediation sessions" (*id.* ¶ 78).

As Defendants point out, the most "glaring problem" with Plaintiffs' abuse of process claim is that Plaintiffs could not allege that Defendants used, let alone abused, any process at all. Defendants were not party to, nor counsel for, the ADA Lawsuit. And neither the plaintiff in the ADA Lawsuit (William Saar) nor his attorneys (James Higgs and Michael Hyde) were obligated to provide Defendants' invoices to Plaintiffs. A claim for abuse of process lies for the improper use of process, "not for maliciously causing it to issue." *Friedman*, 312 N.W.2d at 594 (quoting *Spear v. Pendill*, 130 N.W. 343, 344 (Mich. 1911)). Accordingly, the Court determines that Plaintiffs have not alleged "an act in the use of process" as required by Michigan law. And, even if Plaintiffs properly alleged an act in the use of process by Defendants, "Michigan common law does not recognize such an action for the mere initiation of a case in order to extort money." *Cruz*, 171 F. Supp. 3d at 660 (citation, quotation marks, and brackets omitted). "[T]he ulterior purpose alleged must be more than … exposure to excessive litigation costs…." *Dalley v. Dykema Gossett*, 788 N.W.2d 679, 695 (Mich. Ct. App. 2010) (citation omitted).

In sum, even assuming arguendo that a state-law abuse of process claim for alleged abuses in federal proceedings may properly lie, and construing Count I in the light most favorable to

Plaintiffs and accepting all well-pleaded factual allegations in the complaint as true, Plaintiffs have failed to state a plausible abuse of process claim under Michigan law.[1]  For these reasons, Plaintiffs' Count I is properly dismissed under Federal Rule of Civil Procedure 12(b)(6).

2.   **Count II:   Trespass**

In support of dismissal of Plaintiffs' Count II, Defendants argue that Plaintiffs do not state a claim for trespass where the outlet mall was open to the public at the time of Defendants' entrance and that Defendants' purpose for entering the land—to test the outlet mall for violations of the ADA—is immaterial (ECF No. 26 at PageID.214, 225).  Defendants point out that Plaintiffs do not allege that the small piece of equipment used—the size of a standard level—in any way "disrupted" the outlet mall or "invaded anyone's private space" (*id.* at PageID.218, 226).

In response, Plaintiffs argue that they have stated a plausible claim of trespass where they alleged that Defendants made an intrusion onto Tanger's property to conduct litigation-related tests and experiments without Tanger's knowledge or consent, i.e., an intrusion that exceeded the limited purpose for which the public is invited to the Tanger Property (ECF No. 27 at PageID.250-252, citing Am. Compl. ¶¶ 44-46).

Defendants' argument has merit.

The parties agree that under Michigan law, a "trespass is an unauthorized invasion on the property of another," *Dalley*, 788 N.W.2d at 691 (ECF No. 26 at PageID.225; ECF No. 27 at PageID.250).  Because a claim for trespass requires an unauthorized invasion, consent is an

---

[1] Defendants also argue that to the extent that Plaintiffs were involved in the use of process, this Court should dismiss Count I because Defendants are absolutely immune as witnesses under Michigan law (ECF No. 26 at PageID.214, 224).  However, given this Court's resolution of Defendants' first two arguments, the Court has not addressed this third alternative basis for dismissal.

absolute defense to a trespass claim.  *Am. Transmission, Inc. v. Channel 7 of Detroit, Inc.*, 609 N.W.2d 607, 613 (Mich. Ct. App. 2000).

In Count II, Plaintiffs allege that Defendants committed trespass on land on November 24, 2017 by making "an unauthorized intrusion onto the Tanger Property . . . for purposes of 'testing' the property and collecting evidence in support of the pending ADA Lawsuit" without having first obtained "the permission of Tanger . . . prior to entering the Tanger Property for this purpose" (Am. Compl. ¶¶ 84-85).  Specifically, Plaintiffs allege that Falstad measured the slope or gradient of walkways throughout the Tanger Property and took photographs of their tests (*id.* ¶¶ 45-46). Plaintiffs allege that "Tanger did not invite Access, Falstad, or the general public to the Tanger Property for purposes of 'testing" the property and collecting evidence in support of threatened or pending litigation" (*id.* ¶ 86).

Plaintiffs rely on the Michigan court of appeals' decision in *Woodland v. Michigan Citizens Lobby*, 341 N.W.2d 174 (Mich. Ct. App. 1983), *aff'd* 378 N.W.2d 337 (Mich. 1985), for the proposition that Plaintiffs' consent to the public to enter the property was for "limited" purposes. However, *Woodland* is procedurally and factually different from the case at bar.  *Woodland* was an action for injunctive relief to prevent a consumer interest group from soliciting shoppers and gathering signatures on initiative petitions on the shopping mall owner's premises.  The factual basis for affirming the permanent injunction—that the defendant-lobby's activity of expressing political views and soliciting shoppers in furtherance of such political views was inconsistent with the plaintiff's use of its private property and "unwarrantedly diminish[ed] plaintiff's property rights and injur[ed] its business," *id.* at 176—is not alleged or present here.  Specifically, Plaintiffs do not allege that Defendants' purpose in entering the property—to test the outlet mall for ADA

13

violations—invaded any of the specific interests relating to the peaceable possession of land that the tort of trespass seeks to protect.

Defendants' activity on November 24, 2017 in testing the outlet mall for ADA violations is instead closer to the defendant's activity in *American Transmission*, recording interactions with the plaintiffs' transmission repair personnel to test for consumer fraud. There, the Michigan court of appeals held that even if a customer misrepresents her purpose, a landowner's consent to enter property is still valid where the customer "did not invade any of the specific interests relating to the peaceable possession of land that the tort of trespass seeks to protect." *Id.* at 613-14 (adopting the reasoning in *J.H. Desnick, M.D. v. Am. Broadcasting Cos., Inc.*, 44 F.3d 1345 (7th Cir. 1995) (Posner, C.J.) (journalists posing as patients at an eye surgery center to test for Medicare abuses)).

Therefore, construing Count II in the light most favorable to Plaintiffs and accepting all well-pleaded factual allegations in the complaint as true, the Court determines that Plaintiff has not stated a plausible trespass claim under Michigan law. Consequently, Count II is also properly dismissed under Rule 12(b)(6).

3.   **Count III:   RICO**

Last, in support of dismissal of Plaintiffs' Count III, Defendants argue that Plaintiffs' RICO claim fails because Plaintiffs have failed to plead their injuries with requisite particularity (ECF No. 26 at PageID.214, 227). Defendants argue that Plaintiffs also cannot establish causation because the acts they identify did not, and could not, support their theory of damages (*id.* at PageID.214, 227). For example, Defendants point out that while Plaintiffs' claim that Defendant Clarence Falstad committed wire fraud by sending two false invoices "for purposes of defrauding

[Plaintiffs] into settling the ADA Lawsuit," Plaintiffs did not settle the case (*id.* at PageID.214-215, quoting Am. Compl. ¶ 89).

In response, Plaintiffs argue that their Amended Complaint more than satisfies the particularity requirement where the Amended Complaint (a) specifies the statements that Plaintiffs contend to be fraudulent, to wit: the invoices Falstad sent in October and December 2017; (b) identifies the "speaker" and creator of the invoices as Defendant Falstad; (c) alleges with particularity that Falstad fabricated the false invoices in Las Vegas, Nevada and transmitted them by wire to Michigan; and (d) sets forth why the statements at issue are fraudulent. (ECF No. 27 at PageID.253-254). Plaintiffs argue that the facts in their Amended Complaint are also sufficient to allege proximate causation of a cognizable injury where they allege that Falstad, as part of his his ultimate scheme to deceive Tanger into paying him for "expert witness" fees that were predicated on fraudulent invoices, contacted Saar, convinced him to file a federal lawsuit against Tanger, recruited attorneys to represent Saar, and provided the attorneys with a draft complaint and instructions regarding who they should sue (*id.* at PageID.255-256).

In reply, Defendants emphasize that the injury that Plaintiffs must demonstrate is harm resulting "from the predicate acts"—here, the transmission of the invoices (ECF No. 28 at PageID. 269-270). Defendants conclude that Plaintiffs cannot establish causation for their RICO claim because the transmissions could not have caused the filing of the ADA Lawsuit where the lawsuit was initiated before the invoices were transmitted (*id.*).

Defendants' argument has merit.

RICO's provision for civil actions provides that "any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate

United States district court." 18 U.S.C. § 1964(c).  Section 1962(c) of the RICO, in turn, makes it "unlawful for any person employed by or associated with any enterprise engaged in . . . interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).  "Within the numerous sorts of relationships that can constitute a pattern, two elements must be shown: 'that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity.'"  *Brown v. Cassens Transp. Co.*, 546 F.3d 347, 354 (6th Cir. 2008) (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)).

A RICO plaintiff must show "some direct relation between the injury asserted and the injurious conduct alleged."  *Holmes v. Sec. Investor Protection Corp.*, 503 U.S. 258, 268 (1992).  "[A] RICO plaintiff who can show a direct injury may still lose the case if the injury does not satisfy other traditional requirements of proximate cause—that the wrongful conduct be a substantial and foreseeable cause and that the connection be logical and not speculative."  *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 615 (6th Cir. 2004).  "The Supreme Court has repeatedly held that plaintiffs attempting to assert an injury 'by reason of' a RICO violation must demonstrate both but-for causation and proximate causation."  *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 487 (6th Cir. 2013).

Because RICO claims require proof of mail or wire fraud as an element, the plaintiffs must also satisfy the heightened particularity requirements of Federal Rule of Civil Procedure 9(b) with respect to the elements of fraud.  "Rule 9(b) states that '[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.'"  *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 403 (6th Cir. 2012) (quoting FED. R. CIV. P.

16

9(b)). This obligation includes alleging the "time, place, and content" of the fraudulent acts, the existence of a fraudulent scheme, the intent of the participants in the scheme, and "the injury resulting from the fraud." *Id.*

Here, Plaintiffs allege wire fraud, as follows:

> Falstad has engaged in a pattern of racketeering activity. This pattern is evidenced by at least two predicate acts of wire fraud, in violation of 18 U.S.C. § 1343. Specifically, in October 2017 and then in December 2017, Falstad caused false and fraudulent invoices to be transmitted through interstate commerce by wire for purposes of defrauding Tanger into settling the ADA Lawsuit based on dramatically inflated and false "expert witness" costs.

(Am. Compl. ¶ 89). Plaintiffs allege that "Falstad intended to engage in the alleged predicate acts of wire fraud, knowing that said predicate acts are illegal" (*id.* ¶ 93). Plaintiffs allege "[a]s a direct and proximate result of Falstad's [wire fraud], Tanger has been damaged in an amount to be determined at trial" (*id.* ¶ 96).

The Court agrees that Plaintiffs' allegation of injury is insufficient inasmuch as it fails to allege how, or to what extent, Falstad's alleged wire fraud injured Plaintiffs. To the extent Plaintiffs attempt to frame their injury as "having to defend against the ADA Lawsuit" (ECF No. 27 at PageID.254), the Court further agrees with Defendants that the alleged sequence of events does not support such a claim. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)). In short, Count III is also properly dismissed for failure to state a plausible civil RICO claim.

## III. CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss (ECF No. 25) is GRANTED.

Because all pending claims in this case have been dismissed, a Judgment will be entered consistent with this Opinion and Order.  *See* FED. R. CIV. P. 58.

DATED: June 6, 2019

/s/ Janet T. Neff
JANET T. NEFF
United States District Judge